Willie E. **WRIGHT**

v.

Richard **SCHWEIKER,** Secretary, Health and Human Services.

Civ. A. No. 80–3647.

United States District Court,
M.D. Tennessee,
Nashville Division.

Jan. 17, 1983.

Legal Services of Middle Tenn., Nashville, Tenn., for plaintiff.

Joseph B. Brown, Jr., U.S. Atty., Nashville, for defendant.

## MEMORANDUM

JOHN T. NIXON, District Judge.

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of the final decision of the Secretary of Health and Human Services denying plaintiff a period of disability, disability insurance benefits and supplemental security income benefits as provided by Titles II and XVI of the Social Security Act, as amended. 42 U.S.C. §§ 416(i), 423(d) and 1382c(a)(3). The case now pends on cross-motions for summary judgment. For the reasons stated, the plaintiff's motion will be granted.

This plaintiff's encounters with the Social Security Administration [SSA] cover a long period of time. In June of 1969, plaintiff, who was born on November 16, 1941, filed a Title II application. (tr. 77). The SSA denied the claim initially. On December 30, 1969, plaintiff filed his second Title II application alleging an injured left hand, a bad heart, and kidney trouble as disabling impairments. (tr. 85). On initial consideration the SSA, conceding diagnoses of mental deficiency, an IQ of 69, probable epilepsy, mild anemia, and flexion contracture of the left middle finger, granted plaintiff a period of disability commencing November 18, 1969. (tr. 89). In December of 1972, upon periodic review, the SSA determined that plaintiff's period of disability ceased in July of 1971 and, therefore, his entitlement to a period of disability and to payment of benefits would cease at the end of September 1971. (tr. 91). At about that same time, plaintiff was advised that he had been over-paid $2,170.20. (tr. 93). Plaintiff apparently filed a request for a waiver of the recoupment of the overpayment but that request was denied on the finding that plaintiff had returned to work in July of 1970 and had failed to advise the SSA of that fact. (tr. 95).

The record does not disclose what happened from that time until January 3, 1975, when plaintiff filed another application for Title II benefits and alleged that a heart condition and an injured right hand had disabled him as of December 27, 1974. (tr. 98). This claim was denied initially. It appears that during the relevant periods on this application, plaintiff continued to work at least part-time. (tr. 103). The plaintiff was notified of the decision on March 31, 1975. (tr. 104).

On October 21, 1975, plaintiff filed another application for Title II benefits. (tr. 106–109). This claim was denied initially, although the SSA conceded diagnoses of psychoneurosis with functional chest pain and borderline anemia. (tr. 110). The claim was denied after reconsideration. Plaintiff was afforded a hearing on October 7, 1976, before an administrative law judge [ALJ] and was represented. On November 22, 1976, the ALJ issued his denial decision. (tr. 246–253). On April 1, 1977, the Appeals Council [AC] declined to grant plaintiff's request for review. Apparently plaintiff did not appeal this decision.

On June 1, 1977, plaintiff filed another application for Title II benefits alleging he was disabled as of September 1976 because of back trouble, an enlarged heart, dizzy spells, leg trouble, and an operation on his hands. (tr. 256). Conceding a diagnosis of status post fracture of the right ankle, the claim was denied initially. (tr. 260). How-

ever, on reconsideration, the SSA granted plaintiff a period of disability commencing September 15, 1976. (tr. 262). The disabling impairments were listed as mild mental retardation and status post fracture of the right ankle. In December of 1978 the SSA on periodic review found that plaintiff was failing to cooperate and, therefore, found that his disability ceased in November of 1978 and his period of disability and payment of benefits would cease or terminate at the conclusion of January 1979. (tr. 263, 283). Apparently plaintiff took no further action.

However, on September 24, 1979, he filed another application for Title II benefits and this time an application for Title XVI benefits. (tr. 284, 288). On the Title II application he alleged he was disabled as of July 1979 because of problems with his "colon, back, right leg and ankle." (tr. 284).

This time the SSA conceded a diagnosis of peripheral arthritis but denied the claims initially (tr. 292, 294) and on reconsideration. (tr. 296–297). On April 9, 1980, the plaintiff was afforded a hearing before an ALJ. He was represented, and he and a relative testified in his behalf. On July 24, 1980, the ALJ issued his denial decision. (tr. 9–19). On September 12, 1980, the AC declined to grant plaintiff's request for review. Thus, the ALJ's decision became the Secretary's final decision. 20 C.F.R. §§ 404.981 and 416.1481. This civil action was thereafter timely filed and, on February 26, 1981, the Court remanded these claims for the purpose of receiving additional evidence with regard to plaintiff's mental impairment, if any, and to reconsider the claims.

On July 22, 1981, the AC remanded the claim to an ALJ for further proceedings. (tr. 252). On September 22, 1981, a supplemental hearing was held and the plaintiff was represented by an attorney. On March 15, 1982, the ALJ issued his decision recommending that plaintiff's applications be denied. (tr. 437–444). On April 28, 1982, the AC adopted the findings and conclusions in the recommended decision. (tr. 436). This civil action was thereafter reopened on June 16, 1982, upon the filing of the supplemental transcript.

The criteria for evaluating disability under the Supplemental Security Income Program are essentially the same as those which apply in the Social Security Disability Insurance Program. 42 U.S.C. §§ 423(d) and 1382c(a)(3); 20 C.F.R. §§ 404.1501, et seq.[1] Likewise, the standard of judicial review is similar for both programs. 42 U.S.C. §§ 405(g) and 1383(c)(3). Thus, the only issue before this Court is whether the final decision of the Secretary that plaintiff was not disabled is supported by substantial evidence.

■ The determination of disability under the Act is an administrative decision, and the only question before the Court is whether or not, in light of the record made in the administrative hearing process, the decision of the Secretary is supported by substantial evidence. Substantial evidence means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. It is more than a scintilla. *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *LeMaster v. Weinberger,* 533 F.2d 337 (6th Cir.1976).

■ The plaintiff would be considered disabled if he were unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or to last at least 12 months. Substantial gainful activity includes both previous work performed by the plaintiff, and, considering age, education and work experience, any other work which exists in the national economy in significant numbers; it is immaterial whether such work exists in the immediate area in which the plaintiff lives, or whether a specific job vacancy exists or whether the plaintiff would be hired if he applied. The burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. Plaintiff must es-

---

1. The Court will cite only the statute or regulation applicable to the Title II claim.

tablish that he not only has an impairment as defined but that such impairment was severe enough to preclude his engaging in any substantial gainful activity. *Ragan v. Finch,* 435 F.2d 239 (6th Cir.1970).

■ In reviewing the decisions of the Secretary, courts look to four types of evidence: (1) objective medical findings regarding plaintiff's condition; (2) diagnoses and opinions of medical experts; (3) subjective evidence of plaintiff's condition; and (4) plaintiff's age, education, and work experience. *Miracle v. Celebrezze,* 351 F.2d 361 (6th Cir.1965).

At the most recent hearing, the plaintiff testified that he was 40 years old at that time. (tr. 468). He is 5′7″ and weighed 155 pounds, although his usual weight is about 165 pounds. There is some evidence that the plaintiff occasionally drove his automobile up until the time it broke down shortly before the hearing. He testified that he cannot work because of his left hand and his shoulders. He has cramps which "cuts off his wind" when he exerts himself. His right leg causes difficulty in standing. He has difficulty with his back, his hearing and his memory. (tr. 459). He has difficulty sleeping because of breathing problems caused by lying down. (tr. 460–461). He does not believe he could lift and carry 25 pounds. With regard to his dizziness, he states if he remains seated he has no difficulty. (tr. 462). During the day, plaintiff apparently stays at home. He takes medicine for nerves. Plaintiff testified that he has fallen. He is unhappy all the time. (tr. 466, 467). He testified he last worked at a warehouse driving a truck in 1979. (tr. 468, 469). He is treated at the Matthew Walker Health Center. (tr. 470). The plaintiff testified to some ideas of paranoia on direct, although when examined by the ALJ he stated that he did not think that he was being threatened. (tr. 476, 477).

According to the most recent medical reports from the Matthew Walker Health Center, plaintiff has been treated or diagnosed as having depressive disorders. (tr.

493). He was treated for complaints of leg pain, chest pain, and pain in the shoulders and arms, and weakness.[2] A chest x-ray produced evidence of slight cardiomegaly but the lung fields were clear and otherwise were within normal limits. (tr. 494). In September of 1981 he was being seen because of an upper respiratory infection. Nothing out of the ordinary was seen on physical examination. (tr. 495). Apparently the cold had persisted from sometime in August. (tr. 496). Dr. Robert W. Magee of the Matthew Walker Health Center wrote a letter in October of 1981 stating that the plaintiff had been followed there and had a diagnosis of clinical depression. He further stated it had been recently discovered that Wright had significant anemia. He did not express an opinion as to the plaintiff's vocational abilities or residual functional capacity one way or the other. (tr. 497).

In December of 1980 the plaintiff was seen by Dr. Kenneth Anchor, a clinical and consulting psychologist. As a result of his testing, plaintiff's IQ was 66, which placed him in the mentally defective range of intellectual functioning. Dr. Anchor stated that short-term retention was very poor as were most areas requiring skills and verbal expression. He further stated, however, that in the performance area plaintiff does retain some fundamental abilities in working with his hands and in attending to his environment. Wright's thinking was confused with unusual concern for his physical health and suspiciousness of others, according to Dr. Anchor. He also noted that there was evidence of a high level of anxiety. Based on his test data, Dr. Anchor thought that it was extremely doubtful that plaintiff could return to any of his previous jobs because of the lifting requirement. Further, Dr. Anchor did not think Wright was capable of performing a vast majority of sedentary jobs available in the region because of his lack of resources. Dr. Anchor stated, "He might be capable of performing a limited number of light work exertion assignments but they should not be ones which require bending, climbing,

---

**2.** Portions of this report are illegible. (tr. 493).

stooping, crawling, stretching, or extensive standing, walking, or sitting. He should not be expected to lift objects in excess of approximately 15 pounds on a frequent basis." (tr. 485). Dr. Anchor stated that the plaintiff's contact with reality was erratic and that under moderate stressful conditions he could lapse into confused thinking, anxiety and social withdrawal. He thought he would probably benefit from an extensive program of occupational therapy. (tr. 485).

The evidence of record prior to remand seems to corroborate Dr. Anchor's appraisal, both on the basis of the plaintiff's mental and physical capacity. As far back as February 1970, the plaintiff's anemia to one degree or another has been documented (tr. 154, 155), although no proof of its effect on his vocational abilities has ever been produced. While his physical examination at the time was quite good, "mental retardation" and possible epilepsy were diagnosed. (tr. 155, 156). Dr. Sprofkin could not give a definitive opinion concerning plaintiff's "spells," based on a normal neurological examination. (tr. 159).

When interviewed for psychological testing in March 1970, the plaintiff was judged as in the mentally defective range with an IQ of 69. (tr. 161, 162). In addition, during this time, Wright's hand injury was of some concern.

Upon examination in October 1972, Dr. David Scheibert, a neurosurgeon in Nashville, diagnosed probable seizure disorder, and recommended additional evaluation, and treatment. (tr. 164). In that same month, Dr. Nicholas De Palma, a clinical psychologist, examined plaintiff and he, too, diagnosed plaintiff as mentally deficient; moron level. (tr. 167). He thought plaintiff could relate properly and could follow the simplest of instructions but nothing more, and could work in a sheltered workshop. (tr. 167). Despite this handicap, the plaintiff's earnings record indicates that he went back to work. (tr. 302).

During 1973 plaintiff was seen at Vanderbilt University Hospital and the test results were fairly normal. (tr. 168–171). In January 1975 he was treated for chest pain. (tr. 174). In December 1975, Dr. Jack Satson, a specialist in internal medicine, examined plaintiff and concluded the chest pain was functional, resulting from psychoneurosis, and that plaintiff was borderline anemic. (tr. 178). Dr. Batson thought plaintiff's symptoms were characteristic of neurosis. He believed plaintiff could perform medium work, or more as long as the anemia was "worked out", but indicated that the neurosis was moderately severe. (tr. 178).

Dr. Joseph Phillips, a psychiatrist, diagnosed anxiety neurosis associated with depression, secondary to occupational dysfunction and indicated that cardio-pulmonary dysfunction and musculo-skeletal dysfunction of the left hand and the left leg should be further considered. He was apparently more impressed by the impact of plaintiff's physical difficulties and urged additional consultations. He noted, however, that if clinical evidence failed to establish vocationally significant physical impairments, psychotherapy would be in order. (tr. 184).

Apart from the evidence of psychoneurosis, plaintiff's right ankle is clearly impaired. (tr. 187, 202, 204). Plaintiff was seen by Dr. L.P. Laughlin, a Board-certified orthopedic surgeon of Nashville, in August of 1976, at the request of the Disability Determinations Section [DDS]. Dr. Laughlin diagnosed ligamentous injury to the right ankle with some "spotty osteoporosis, but no other bone or joint abnormalities." (tr. 232).

Dr. Robert T. Cochran, Jr., a neurologist and specialist in internal medicine, examined plaintiff at the request of the DDS in September 1976. Dr. Cochran thought plaintiff's manner of walking "defied description." Plaintiff placed no weight on his right foot. After a physical examination and in reliance on clinical evidence, Dr. Cochran stated:

Clinically I don't think this man has too much lung disease. He does have considerable weakness in the right leg, but I think it more likely represents disuse atrophy than anything else. He does

have ankylosis of the right ankle secondary to his gunshot wound. This is a big problem, and would limit him to light physical activity. He will have difficulty on prolonged weight bearing and bending and stooping and climbing stairs. Aside from this, however, most of his complaints seem to relate to psychoneurosis and conversion reaction more than anything else. There should be jobs in the economy that this man could do. (tr. 236).

Dr. Kevin O'Brien, a specialist in internal medicine in Nashville, examined plaintiff in June 1977 at the request of the DDS. He examined plaintiff, had the benefit of clinical evidence and concluded that plaintiff has low back syndrome by history, enlarged heart by history, status post fracture of right ankle, and chest pain, etiology to be determined. (tr. 372). Dr. O'Brien could find no evidence of any heart difficulty. Dr. O'Brien said:

He mentions some back difficulty, but was able to bend at the waist touching his toes and straight leg raise was negative bilaterally. As for his left hand, he does have a slight contracture at the base of his left third finger making extension somewhat difficult. He does have a good grip strength in that hand, however. His main problem appears to be his right ankle and for that reason an x-ray was obtained. The results are enclosed. On physical examination, there was some difficulty in the range of motion as mentioned previously. Because of the difficulty Mr. Wright alleges in ambulating and the pain and discomfort he experiences in his right ankle, it appears that he would be best suited for sedentary work, or light work that requires sitting most of the time but involves pushing and pulling of arm control rather than leg control. (tr. 372, 373). [Copied as appears.]

In September of 1977 plaintiff was evaluated at the request of the DDS by Thomas L. Pettigrew, a licensed psychological examiner. After his testing he determined that plaintiff had a full-scale IQ of 67. Mr. Pettigrew placed the plaintiff in the mental defective range of intelligence, though he felt that plaintiff showed more ability on performance items. Achievement results suggest that the discrepancy between verbal and performance achievement is due largely to educational deficiencies. Plaintiff did have considerable deficiencies, however, in other areas such as education level which was determined to be somewhere between the 1.7 and 2.9 grade level. Mr. Pettigrew diagnosed mental retardation, mental defective level IQ 67. (tr. 380). He thought the plaintiff was able to respond to ordinary work pressures without undue difficulty at that time, although his daily activities were mildly reduced primarily because of his physical status. (tr. 380).

In October of 1979, plaintiff was examined by Dr. Grafton H. Thurman, a specialist in internal medicine in Nashville, at the request of the DDS. After his history and physical examination, he judged that there were no significant difficulties with peripheral arthritis. His exercise tolerance was sufficient for routine tests and Dr. Thurman could detect no finding of marked pulmonary pathology on the chest x-ray. Neither could Dr. Thurman detect any objective pathological findings for symptoms relative to the back. However, because plaintiff was stiff and displayed a slight limp, Dr. Thurman believed that plaintiff should avoid heavy physical activity and limit himself to moderate physical activity. (tr. 384).

In January of 1979, plaintiff injured his spine and sacrum as a result of a vehicular accident. (tr. 397). As a result of the examination by Dr. Thurman, a fracture of the left foot was of vocational significance.

In January 1980, Dr. Howard S. Kirshner of the Neurology Clinic of Vanderbilt University Medical Center stated:

The patient's past medical history is significant for (1) gunshot wound to the right lower extremity in which he says fragments of the bullet are still left in place. (2) The patient had a fracture of the right ankle that necessitated open reduction.

Following that, Dr. Kirshner also stated that on examination of motor strength,

there was "give-way weakness noted in the right lower extremity proximally and 1⅘ strength on dorsiflexion of the right foot." (tr. 426). He also noted that the sensory examination was unreliable but did reveal some decreased pin and light touch and vibration loss.

The records of the hospitals are voluminous. They generally show that plaintiff has injuries of his ankles, which are vocationally significant. After carefully considering this entire record, the plaintiff clearly has, at minimum, significant impairments due to the injury to his right ankle and mental deficiency.

The defendant has focused much discussion upon the issue of the plaintiff's credibility. In this file that issue was decided against the plaintiff, and to be sure, there is evidence which supports such a finding. However, the reliability of the plaintiff's own statements is immaterial. Quite apart from his testimony, there is abundant evidence in the record, based even on the medical evidence presented by the Secretary's own consulting physicians, to establish a finding of disability.

■ The ALJ found that the plaintiff could return to his prior job as a taxicab driver. Considering all of the record, the Court concludes that this finding is simply not supported by substantial evidence. Although he has continued to drive his car occasionally, the evidence of significant impairment of his ankle is uncontroverted. In addition, taxicab drivers may be required to lift heavy luggage and a substantial amount of medical evidence establishes he does not have the capacity for lifting over 15 to 25 pounds. At various times, epilepsy and psychoneurosis have been diagnosed and there is clinical evidence to support findings that the plaintiff has poor short term memory and is in the process of social withdrawal. Further, the plaintiff only briefly mentioned that he had driven a cab

approximately 14 years ago, and the nature of the job was not developed. (tr. 37). The Secretary's regulations preclude consideration of work experience that has occurred only for brief periods or more than 15 years previously as too remote. 20 C.F.R. § 404.-1565. In view of the entire record, the Court concludes that the ALJ's finding that Wright could work as a cab driver is unsupported by substantial evidence.

■ More importantly, this Court concludes that the ALJ failed properly to apply the Secretary's regulations in making the disability determination. After reviewing the evidence and the applicable law, the Court finds that under the Secretary's regulations, Wright's condition falls into the category of a listed impairment and a finding of disability was therefore warranted. The Secretary's regulations list impairments considered sufficiently severe in and of themselves to foreclose gainful activity. 20 C.F.R. § 404.1525(a); 20 C.F.R. § 416.-925(a). Pursuant to 20 C.F.R. § 404.1520(d) and § 416.920(d), when a person meets the criteria for a listed impairment, a finding of disability shall be made without consideration of vocational factors, age or education.

The ALJ found that Wright has an IQ of approximately 69.[3] Section 12.05(C) of the impairments listed in Appendix 1 to 20 C.F.R. § 404, Subpart P, describes mental retardation as an IQ of 60 to 69 "and a physical or other mental impairment imposing additional and significant work-related limitation of function." Because, according to the ALJ's finding, Wright's IQ is within the ambit of Section 12.05(C), the only material question is whether Wright has an "additional and significant work-related limitation."

From a review of the record, it appears that the ALJ did not make such an inquiry as required under Section 12.05(C). However, had the ALJ properly applied the reg-

---

**3.** The Secretary argues that the IQ of 69 is "offset" by Wright's performance rating of 76. The argument is without merit. The Secretary's own regulations require that the disability determination be based upon the lowest score obtained, which in this case is 66. 20

C.F.R. § 404, Appendix I, § 12.00(B)(4); (tr. 484; tr. 379). Moreover, the scores of 66 to 69 reflect Wright's "full range" IQ rather than solely his performance level, and was therefore relied upon by the ALJ himself.

ulation, several of the specific findings of the ALJ would have satisfied the requirement of an "additional and significant" limitation.

First, the ALJ indicated, based upon medical evidence, that the plaintiff has injuries of his ankles which are vocationally significant. Second, there was evidence that the plaintiff suffered from forms of mental deficiency in addition to his low IQ. The evidence indicated that his contact with reality is erratic, and that he suffers from confused thinking, anxiety, suspiciousness of others, and social withdrawal. There was further evidence of poor short term memory. Third, the Administration's own consulting physicians recommended that Wright avoid heavy physical activity because of back pain and peripheral arthritis. Wright's treating physician, for these reasons, limited him to light work. The SSA conceded the diagnosis of peripheral arthritis. (tr. 292), and the ALJ himself found that Wright's physical impairments limit him to medium or lesser work.

Whether these impairments are in and of themselves disabling is not the question. Rather, applying Section 12.05(C), the ALJ should have determined solely whether these findings constitute "additional and significant work-related limitations of function." While the regulations do not further explain or define those terms, the regulations do define an impairment as non-severe "if it does not significantly affect your physical or mental abilities to do basic work activities." 20 C.F.R. § 404.1521. Among the abilities and aptitudes listed as necessary in basic work activities are physical functions such as sitting, pushing, and carrying, capacity for speaking, understanding and remembering simple instructions, use of judgment, and responding appropriately.

Under the Secretary's regulations, properly applied, this Court concludes that the ALJ's erred in its determination that the plaintiff is not disabled. The evidence shows that the plaintiff has an IQ of 66 to 69 and that he has significant mental and physical impairments that limit him to medium or lesser work. Accordingly, he has a listed impairment under Section 12.05(C), and should be considered disabled for the purposes of the Act. Having met the Secretary's standards for a listed impairment, no further considerations of, for example, vocational factors need be made prior to a finding of disability. 20 C.F.R. § 1520(d). Moreover, as noted previously, even if such consideration had been appropriate, the ALJ's finding that the plaintiff could work as a cab driver is not supported by substantial evidence.

For the foregoing reasons, the plaintiff's motion for summary judgment will be granted and the defendant's motion for summary judgment will be denied. Accordingly, the decision of the defendant Secretary of the Department of Health and Human Services denying the claimant's Social Security Disability Insurance benefits and Supplemental Security Income benefits as provided by Titles II and XVI of the Social Security Act is hereby reversed. This case will be remanded to the Secretary for the purpose of paying said benefits.